UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*\*\*\*\*\*\*\*\*

JON A. MANAFORT TRUST DATED JUNE 16, 1993;
JASON MANAFORT, INDIVIDUALLY AND AS
TRUSTEE; JUSTIN MANAFORT, INDIVIDUALLY AND
AS TRUSTEE; AND JON A. MANAFORT,
INDIVIDUALLY

PLAINTIFFS

Civil Action No.

VS.

LINCOLN NATIONAL CORPORATION;
THE LINCOLN NATIONAL LIFE INSURANCE
COMPANY; AND LINCOLN FINANCIAL
DISTRIBUTORS, INC.

NOVEMBER 9, 2021

DEFENDANTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COMPLAINT

The plaintiffs, The Jon A. Manafort Trust dated June 16, 1993; Jason Manafort, individually, and as Trustee; Justin Manafort individually and as Trustee; and, Jon A. Manafort, individually complain and allege:

Parties

1.     Plaintiff, the Jon A. Manafort Trust dated June 16, 1993 (hereafter, the "JAM Trust"), is a trust entity established and operating continuously under the laws of the State of Connecticut.

2.     Plaintiff, Jason Manafort ("Jason"), is a citizen of the State of Connecticut, who presently resides at 12 Northeast Road, Farmington, Connecticut.  Jason at all

times relevant has been and serves as a Trustee of the JAM Trust. Jason also brings this action in his individual capacity and as a beneficiary of the Policy and of the JAM Trust.

3. Plaintiff, Justin Manafort ("Justin"), is a citizen of the State of Connecticut, who presently resides at 33 Lena Lane, Plainville, Connecticut. Justin at all times relevant has been and remains a Trustee of the JAM Trust. Justin also brings this action in his individual capacity and as a beneficiary of the Policy and the JAM Trust.

4. Plaintiff, Jon A. Manafort, Jr. ("Jon M"), is a citizen of the State of Connecticut, who presently resides at 14 Rocky Point Road, Old Saybrook, Connecticut. Jon M also brings this action as the insured under the Policy.

5. Defendant, the Lincoln National Corporation, (Lincoln National"), is a holding company which owns and conducts multiple insurance, investment and financial services businesses through subsidiaries with a principal place of business at 150 North Radnor-Chester Road, Radnor, Pennsylvania, 19087.

6. Defendant, Lincoln National Life Insurance Company, ("Lincoln Life"), is a life insurance company and subsidiary of Lincoln National with a principal place of business at 1300 South Clinton Street, Fort Wayne, Indiana 46802.

7. Defendant Lincoln Financial Distributors, Inc. a/k/a Lincoln Financial Group ("Lincoln Financial"), is a financial services company with a principal place of business at 150 North Radnor-Chester Road, Radnor, Pennsylvania, 19087.
and as a subsidiary of Lincoln National.

8. Upon information and belief, the defendants are affiliated and provide insurance and financial services to entities and individuals, including the JAM Trust. At times relevant, Lincoln Life has acquired by merger and owns Jefferson-Pilot. Both are part of the Lincoln National brand and are transacting and conducting business under the Lincoln National name.

## Jurisdiction and Venue

9. A. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that plaintiffs and defendants are citizens of different states, the amount in controversy exceeds Seventy-Five Thousand ($75,000.00) Dollars, exclusive of interest and costs, and the matter presents an actual controversy between and among the parties.

B. The Court has subject matter jurisdiction under the Declaratory Judgment Act, 28 U.S.C. § 2201 et. seq. and F.R.C.P. Rule 57.

10. Venue is appropriate in the Judicial District of Connecticut pursuant to 28 U.S.C. § 1391 since a substantial part of the events or omissions giving rise to the claims alleged occurred in the Judicial District of Connecticut.

11. Defendants transact and conduct business in the State of Connecticut and are subject to the jurisdiction of this Court. At all times relevant in this Complaint, defendants engaged in financial services transactions and writing life insurance in the state of Connecticut.

Life Insurance Policy

12. During the fall of 2004, the JAM Trust filed an application for life insurance in the specific amount of One Million ($1,000,000.00) Dollars on the life of plaintiff, Jon M, with Jefferson-Pilot Life Insurance Company ("Jefferson-Pilot"), a company licensed to issue life insurance in the State of Connecticut with a principal place of business and home office at 100 North Greene Street, Greensboro, North Carolina.

13. On or about, and effective January 1, 2005, Jefferson-Pilot issued a Variable Life Insurance Policy Number JP5510466, (the "Policy") to the JAM Trust in the specified amount of One Million ($1,000,000.00) Dollars on the life of Jon M (the "Insured"). Among other things, this Policy was based on Form UL 3000 and UL 5023.

14. The Policy in question is a Flexible Premium Adjustable Life Insurance Policy, otherwise also known as Universal Life Insurance.

15. The Policy as a universal life insurance plan was to remain in effect throughout the life of the insured provided that conditions of the Policy were met. A true copy of the Policy is appended and incorporated in this Complaint as Exhibit "A".

16. Plaintiff, Jon M, was born in 1946 and purchased the Policy at fifty-eight (58) years of age. The Insured resided in Plainville, Connecticut at the time the Policy was issued.

17. The Policy stated further that it is a Flexible Premium, Adjustable Life Policy with Proceeds payable at death, and that Flexible Premiums payable during life time of Insured, may increase or decrease the Policy value as determined by declared interest and risk rates; and that the Policy was also "non-participating", meaning that no dividends would be paid on the Policy.

18. Under the terms of the Policy, the selected death benefit was "Option 1", meaning payment of the death benefit in the Specified Amount on the date of death.

19. By Policy language and Specifications, the owner at all times relevant was "Jon A. Manafort Trust dated June 16, 1993, with Jason Manafort and Justin Manafort,

Trustees" ("JAM Trust").  The beneficiary at all times remained as stated in the incorporated "application"; and, that beneficiary was identified as the JAM Trust and Jason and Justin.

20.     The Policy also expressly stated and set forth an annual planned premium of Fifteen Thousand Eight Hundred Fifteen ($15,815.00) Dollars, with an initial specific insurance amount of One Million ($1,000,000.00) Dollars.

21. By express language of the Policy, Jefferson-Pilot promised to pay the proceeds of this Policy to the beneficiary upon receipt of due proof that the death of the Insured occurred while the Policy was in force.

22.  By express language of the Policy, Jefferson-Pilot promised to provide an Annual Report to show the activity of the Policy over the previous years including listing premiums paid, expenses charged, monthly deductions, interest asserted and partial surrenders.

23.  By express language in the Policy Specifications, Jefferson-Pilot also promised:

> This policy provides <u>life insurance</u> coverage <u>to the death of the</u> <u>insured if sufficient premiums are paid</u>. The duration of coverage will depend on the amount, timing and frequency of premium payments, interest credited, cost of insurance, any loans or withdrawals and the cost of additional benefits. The planned premium may need to be increased to keep this policy and the coverage in force. (emphasis added)

24.  The Summary of Policy Features explained and promised A "Coverage Protection Guarantee":

> Your policy provides an important <u>Coverage Protection Guarantee</u> which can <u>ensure Your Coverage will continue</u> during the Coverage Protection Guarantee Period <u>even if Your cash surrender Values are insufficient to cover the monthly deductions</u>. (emphasis added)

25.  Most importantly, Jefferson-Pilot established the Policy Coverage Protection Guarantee Period to be <u>in effect between January 1, 2005 and January 1, 2025</u>. (emphasis added)

26.  By definition in the Policy, the Coverage Protection Guarantee means: A policy feature that provides that the policy will remain in effect during the Coverage Protection Guarantee Period subject to the Coverage Protection Guarantee Provisions on Page 11.

27. The Policy Coverage Protection Guarantee expressed, stated and promised that the guarantee provides that the Policy will not enter the grace period because the Policy Cash Surrender Value is insufficient to cover the current monthly deductions as defined in the Policy.

28. Further, the Policy Coverage Protection Guarantee Reinstatement provisions period remained in effect within 90 days after the date of termination provided reinstatement occurs within the Coverage Protection Guarantee Period. The Policy Coverage Protection Guarantee was to run until January 1, 2025.

29. The Policy included a specific grace period which reads as follows:

"Grace Period. If on a monthly anniversary day the cash surrender value is less than the monthly deduction due, a grace period of 60 days from that date will be allowed for the payment of the minimum amount needed to continue the policy. <u>If the no lapse guarantee provision is in effect and the no lapse test has been met, the grace period will not begin and the policy will not be subject to termination under this provision.</u>" (emphasis supplied)

30. The Policy further promised:

"We will notify you and any assignee of the minimum amount due at least 30 days before the end of the grace period. If the amount specified is not paid within the grace period, the policy will terminate without value at the end of such period. If the insured dies within the grace period, the amount needed to continue the policy to the end of the policy month of death will be deducted from the amount otherwise payable."

31. Later, on or about 2006, on information and belief, Lincoln National Life Insurance Company, ("Lincoln Life") acquired Jefferson-Pilot by acquisition and merger and acceded to the rights and duties of Jefferson-Pilot under the Policy. At all times relevant, Lincoln Life along with its parent, Lincoln National, have become the insurer and undertaken the legal duty and responsibility to administer and timely comply with the terms of the Policy.

<u>Lincoln National Authorized Agent</u>

32. On information and belief, due in part, to the complicated nature of the flexible payment form of variable life insurance, defendants designate an agent if the Policy owner is not already working with a Lincoln Life authorized agent. That agent at all times has the responsibility to provide advice to the Policy owner and insured.

33. At all times relevant, Dennis F. Berti ("Berti") of 60 Avon Meadow Lane, Avon, Connecticut, participated in the transactions and interactions alleged in this Complaint as agent of record on the Policy and at all times relevant remained an authorized agent of defendants, number 2063870.

34. Berti was also responsible for servicing and maintaining the Policy on behalf of defendants and at all times relevant, on information and belief, had a fiduciary duty to provide counsel and advice to the Policy owner, plaintiff JAM Trust, and to the insured, JonM; and, to the Trustees, Jason and Justin.

35. Berti at all times relevant was an agent or representative of defendants also responsible for advising plaintiffs with regard to premium strategy and the financial management of the Policy.

36. At all times relevant, defendants were to send an annual invoice to Berti and also to the JAM Trust which, among other items, identified the Policy Number, a Due Date and the Payable "Annual" amount for life insurance premium.

37. Defendants also represented that the cost of Universal Life Insurance under the Policy is not dependent on the consistency of premium payments. The cost of insurance changes and administrative expenses are deducted monthly to provide the insurance protection.

38. At all times relevant, the Policy and the flexible financial requirements were and remain unduly complicated and confusing to the ordinary owner and insured. Accordingly, the defendants at all times relevant continued to recommend and advise the involvement of a Lincoln National agent: In particular, defendants represented and stated:

> When this type of policy [*i.e.* the Policy] is issued, the owner with help from the agent sets a schedule of premium payments based on policy costs and provisions.

39. At all times relevant, and given the complexity of the Policy, plaintiffs relied on Berti's advice and counseling to their detriment.

**Count One** Breach of Contract

40. At all times relevant, plaintiffs were, and remain, entitled to receive all the rights, benefits and privileges of and under the Policy.

41. At all times relevant, plaintiffs were entitled to receive timely and proper notice of any premium amounts claimed due by defendants.

42. From the time the Policy was issued to the present date, plaintiffs have paid at least $198,982.64 in premiums which meets the noticed annual insurance premiums required and received by defendants.

43. Plaintiffs' intention was always and remains to continue to pay the minimum premium required by the terms of the Policy and keep the life insurance in effect.

44. Plaintiffs are and have been ready, willing and able to pay any and all outstanding premium amounts owed on the Policy.

45. Defendants have refused any and all of plaintiffs' attempts and efforts to make payment, to maintain the Policy in effect or to reinstate the Policy, if deemed necessary.

46. Plaintiffs are unable to secure replacement life insurance coverage.

47. The Policy by its terms provided protection by the Coverage Protection Guarantee and should never have entered a grace period, should never have been lapsed by defendants and should still be and remain in force.

48. As a direct and proximate result of the defendants' breaches of the Policy terms, as well as, the direct and proximate result of the defendants' wrongful failure or neglect to comply with the Policy terms and promises, including neglect or failure to provide proper notices, failure or neglect to provide the promised coverage protection guarantee, and later properly to apply the grace period, if the coverage guarantee had expired, plaintiffs were wrongfully deprived of their rights under the Policy.

49. Defendants wrongfully terminated the Policy in breach of the Policy on December 8, 2020.

50. As a direct and proximate result of defendants' breach of the Policy contract, plaintiffs have suffered injury, harm and loss including termination of the Policy.

## Count Two- Declaratory Judgment

1. Paragraphs 1-49 are repeated and re-alleged as paragraphs 1-49 of this Count Two as if fully set forth herein.

50. An actual case and justiciable controversy exists between plaintiffs and defendants regarding whether defendants could terminate the Policy; whether the Policy lapsed when defendants breached Policy; whether alternatively defendants are obligated to reinstate the Policy; and a declaratory judgment pursuant to *Conn. Gen. Stat.* § 52-29; 28 U.S.C. § 2201; and F.R.C.P. Rule 57, is necessary and appropriate to determine the rights and duties of plaintiffs and defendants concerning the Policy.

51. Plaintiffs seek a declaratory judgment that the Policy never lapsed and remains in force pursuant to *Conn. Gen. Stat.* § 52-29; 28 U.S.C. § 2201; and FRCP Rule 57.

52. Alternatively, if the Policy has lapsed, plaintiffs request a declaratory judgment pursuant to *Conn. Gen. Stat.* § 52-29; 28 U.S.C. § 2201; and F.R.C.P. Rule 57 that the Policy will be reinstated effective December 8, 2020 retroactively upon payment of a properly noticed premium.

## Count Three- Equitable Reinstatement

1. Paragraphs 1-49 are repeated and re-alleged as paragraphs 1-49 of this Count Three as if fully set forth herein.

50. From the issuance of the Policy on January 1, 2005 through December 31, 2018, on information and belief, the defendants provided statements of accounts which contained information of amounts becoming due and the necessary amounts to maintain the Policy, and the plaintiffs paid these amounts.

51. Routinely and almost monthly after January 1, 2019 through September, 2020, defendants would send requests for minimum payments addressed to the JAM Trust. Plaintiffs would remit these ongoing payments.

52. At some point around the start of February 2020, notices were no longer sent to the JAM Trust address in Old Saybrook, Connecticut. The address was changed by defendants to "12 North East Drive, Farmington, CT 06032". This address was not as requested by plaintiffs or accurate, as the actual address change requested was: "12 Northeast Road". Thereafter, any notices actually received were received untimely.

53. From and after January 1, 2019, plaintiffs continued to rely on the receipt of policy coverage notices and premium reminder notices to ascertain the status of the Policy; to determine if any premiums were owed; and, if so, to learn the proper amount to pay defendants. Without the receipt of timely notices, plaintiffs would not know if any payment was due or the amount of such required payment.

54. Defendants knew or should have known that plaintiffs relied upon defendants to provide the aforementioned policy coverage notices and premium reminder notices.

55. Around October 1, 2020, defendants claim to have sent a letter by regular mail indicating that the Policy had entered a grace period for charges due October 1, 2020. Defendants wrote requesting a minimum payment of $2,443.51 by December 3, 2020 to support coverage through October 31, 2020. Defendants also claim to have

sent a copy to their Agent, Berti. Then again, on November 2, 2020, defendants claim to have sent another letter by regular mail indicating that if only $2,443.51 is paid, the Policy would again reenter a grace period. The letter further called for a payment of $7,489.49 before December 3, 2020 to maintain the Policy until December 31, 2020. Defendants also claim to have sent a copy of this letter to their Agent, Berti. Both letters allegedly were mailed to the JAM Trust at the incorrect address of "12 North East Drive" in Farmington, Connecticut.

56. By a letter dated December 8, 2020, defendants claim further that a minimum payment was not received by the end of the "grace period" and the defendants caused the Policy to lapse December 8, 2020. Defendants failed to apply the non-forfeiture language of the Policy and placed the Policy in "grace period" limbo. In the same letter, defendants informed plaintiffs that they had an option to apply for reinstatement and that defendants "encouraged" plaintiffs to consider this option.

57. As encouraged, plaintiffs did follow the reinstatement process and timely prepared, signed and submitted reinstatement questionnaire.

58. In addition, in good faith and to demonstrate the intent to continue premium payments, early in December, 2020, Jason made a phone payment to defendants and received a confirmation number, only later to be informed by defendants that the payment would not be processed or accepted over the telephone and proceeded to claim the payment as not accepted due to defendants' claim of Policy lapse.

59. Plaintiffs timely submitted a request for reinstatement, however, by letter dated March 11, 2021, defendants refused to reinstate the Policy and told Jon Manafort that defendants were 'unable to offer you any coverage' and attributed their denial to the medical history as outlined in the medical records of Dr. Antin-Ozerkis.

60. Again, by letter dated April 6, 2021, defendant reaffirmed that defendants would not approve the reinstatement request.

61. All these interactions, attempted regular mail communications and responses were occurring during the Covid-19 pandemic and at a time when businesses and the U.S economy were in serious jeopardy, dealing with uncertainty and business failures and attempting to function with fewer employees.

62. Defendants knew or should have known that plaintiffs would rely on them and their Agent, Berti, to provide timely information and advice with respect to how to financially manage the Policy to keep it from lapsing.

63. On information and belief, plaintiffs' failure to remit payment of the outstanding premiums prior to December 8, 2020, was a direct result of defendants' failure to issue, properly address, or deliver the premium reminder notices for the

October, November and December 2020 premium due dates, and failure to provide Berti with copies to advise plaintiffs with respect to financially managing the Policy to keep it from lapsing.

64. Plaintiffs had no other reasonable means of determining the premium payment and financial status of the Policy, and the amount of payments due, other than relying on the receipt of notices from defendants, and/or the receipt of advice from Berti.

65. Plaintiffs' failure to remit payment of the outstanding premiums before December 8, 2020 did not prejudice defendants as plaintiffs were at all times, and for over fifteen years were, ready, willing and able to remit and did remit full payment for any outstanding premiums upon notice that the Policy cash value may be insufficient; and, in fact, in addition, did tender such a payment to defendants by telephone upon receiving any indication of the nonpayment of a premium.

66. Defendants will not suffer any significant or undue prejudice from reinstatement of the Policy since (1) plaintiffs are ready, willing, and able to pay all outstanding premiums with interest; and (2) defendants encouraged and indicated a willingness to reinstate the Policy if plaintiffs provided updated medical information and the harm from loss of the Policy is a disproportionate forfeiture.

67. Plaintiffs should be afforded lenience in advertently failing to tender payment by December 8, 2020, considering plaintiffs' lack of knowledge of the amount of payment due, the national economic conditions due to the Covid-19 pandemic, and the conduct of the defendants mentioned herein.

68. In light of the pandemic and surrounding circumstance, as well as the protective language of the Policy, defendants' unfair handling of the matter, including failure to account for the coverage protection guarantee, in view of the more than fifteen years of payments, and plaintiffs' accidental failure to pay the outstanding premiums before December 8, 2020, and plaintiffs' clear intent to make a payment, plaintiffs seek equitable reinstatement of the Policy. A forfeiture of the Policy after fifteen years of payments is inequitable and the Court should intervene to order reinstatement of the Policy.

**Count Four-** <u>Breach of Covenant of Good Faith and Fair Dealing</u>

1 Paragraphs 1-49 are repeated and re-alleged as paragraphs 1-49 of this Count Four as if fully set forth herein.

50. Paragraphs 50-68 are repeated and re-alleged as paragraphs 50-68 of this Count Four as if fully set forth herein

69. At all times relevant, the Policy is a contractual agreement which contains an implied covenant of good faith and fair dealing, requiring the defendants to deal honestly and in good faith with the plaintiffs.

{00395323.DOCX. }

10

70. The conduct of the defendants as alleged in this Complaint, including the perfunctory termination of the Policy under pandemic conditions and contrary to Policy language, was purposeful and intended to cause the termination of the Policy to avoid eventual payment of a significant death benefit under the Policy; and despite the defendants having received substantial premium payments over fifteen years.

71. The conduct of the defendants as alleged in this Complaint reveals a corporate motive and design to mislead or deceive plaintiffs into failing timely to pay premiums and thereby procure termination of the Policy after years of premium payments.

72. In addition, when plaintiffs requested a true and accurate copy of the Policy, defendants failed to provide the true and accurate Jefferson-Pilot Policy with the extended coverage protection guarantee and grace period. *See*, Exhibit "A" appended.

73. The conduct of the defendants in failing to provide the actual Policy and denial of reinstatement on the basis of a medical excuse was deceptive and wrongful.

74. The defendants' conduct in facilitating and then terminating the Policy for no valid reason with the consequent forfeiture of death benefit is dishonest, egregious, morally reprehensible and in obvious bad faith in the face of a tendered payment.

75. The defendants' conduct constitutes a deliberate breach of the implied covenant of good faith and fair dealing resulting in disproportionate forfeiture with no actual prejudice to the defendants.

76. As a direct and proximate result, plaintiffs have suffered injury and damages in the form of a terminated Policy and a disproportionate forfeiture.

**Count Five**: Connecticut Unfair Trade Practices/Unfair Insurance Practices

1. Paragraphs 1-49 are repeated and re-alleged as paragraphs 1-49 of this Count Five as if fully set forth herein.

50. Paragraphs 50-68 are repeated and re-alleged as paragraphs 50-68 of this Count Five as if fully set forth herein.

69. Paragraphs 69-75 are repeated and re-alleged as paragraphs 69-75 of this Count Five as if fully set forth herein

76. At all relevant times, the defendants were engaged in the conduct of trade or commerce in or having an impact in the state of Connecticut as defined by the Connecticut Unfair Trade Practices Act (CUTPA), *Conn. Gen. Stat*. § 42-110a and the Connecticut Unfair Insurance Practices Act (CUIPA), *Conn. Gen. Stat*. § 38a-815.

77.     At all relevant times, defendants were an insurer as defined by the Connecticut Unfair Insurance Practices Act (CUIPA), *Conn. Gen. Stat.* § 38a-815.

78.     At all relevant times hereto, defendants were prohibited by CUTPA § 42-110b from engaging in unfair or deceptive acts or practices in the conduct of trade or commerce in Connecticut.

79.     Defendants have at all times relevant engaged in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of CUIPA § 38a-816(1), CUPTA § 42-110b, and the public policy of the state of Connecticut by engaging in conduct, including, but not limited to, the following:

a. Misrepresenting the benefits, advantages, terms or conditions of the Policy issued to plaintiffs and/or providing plaintiffs with an inaccurate and false Policy to enable misrepresentation for the purpose of inducing or tending to induce a forfeiture or lapse of the Policy and avoid paying the significant death benefit under the Policy, in violation of CUIPA § 38a-816(1)(a) and (f);

b. Misrepresenting the benefits, advantages, terms or conditions of the Policy and/or providing plaintiffs with an inaccurate and false Policy to enable misrepresentation for the purpose of inducing or tending to induce a forfeiture of the Policy; then terminating the Policy; and later encouraging plaintiffs to apply for reinstatement of the Policy and representing that the Policy will be reinstated upon "evidence of medical insurability" while not rendering such decisions on medical considerations, but rather upon defendants' financial self-interest and/or unfair age discrimination, in violation of CUIPA § 38a-816(1)(a) and (f);

c. Acting with dishonest purpose by sending a Policy lapse notice under a false Policy when the actual Policy contained an applicable coverage protection guarantee protecting from a lapse notice to avoid paying a death benefit under the actual Policy, in violation of CUTPA § 42-110b;

d. Failing to reveal and provide the true and complete Policy issued by Jefferson-Pilot; concealing the Policy and substituting language to eliminate the full scope and protective language of the Jefferson Pilot Policy; and/or

e. Acting with dishonest purpose by terminating the Policy when the language and provisions and circumstances of the actual Policy would not allow such termination and then encouraging plaintiffs insureds to apply for reinstatement of the variable premium life insurance Policy, and representing that the Policy will be reinstated upon "evidence of medical insurability" and then not rendering such decisions upon medical considerations; but rather on defendants' financial self-interest and/or unfair age discrimination, in violation of CUTPA § 42-110b.

80. Such immoral, unethical, oppressive and/or unscrupulous conduct offends public policy as established by Connecticut statutes, common law and otherwise, including, but not limited to *Conn. Gen. Stat.* § 38a-816.

81. Defendants engaged in illegal conduct by providing a false Policy when defendants knew or should have known that termination under the actual Policy was not appropriate and using the false Policy to deceive and mislead the plaintiffs and thereby enable termination of the Policy.

82. Defendants' conduct in withholding the true Policy is an omission and concealment constituting a misrepresentation of fact as to the status of the Policy, which defendants knew or reasonably should have known would mislead the plaintiffs and thereby result in the termination of the Policy.

83. Defendants' immoral, unethical, oppressive and/or unscrupulous conduct has no countervailing benefits to consumers or competition.

84. Defendants' immoral, unethical, oppressive and/or unscrupulous conduct was intended to deprive plaintiffs of their rights, privileges and benefits under the Policy, primarily the payment of death benefits to his beneficiaries, for which benefits plaintiffs have paid approximately Two Hundred Thousand ($200,000.00) Dollars to date for life insurance protection.

85. Defendants' immoral, unethical, oppressive and/or unscrupulous conduct reveals a reckless indifference to the rights of the plaintiffs and/or a conscious intentional and wanton violation of those rights.

86. As the direct and proximate result of the defendants' misconduct and violation of CUTPA and CUIPA, the plaintiffs have suffered loss, injury and actual damages by the forfeiture and termination of a significant Policy.

### **Count Six-** Breach of Fiduciary Duty by Defendants

1. Paragraphs 1-49 are repeated and re-alleged as paragraphs 1-49 of this Count Six as if fully set forth herein.

50. Paragraphs 50-68 are repeated and re-alleged as paragraphs 50-68 of this Count Six as if fully set forth herein.

69. Paragraphs 69-75 are repeated and re-alleged as paragraphs 69-75 of this Count Six as if fully set forth herein

76. Paragraphs 76-86 are repeated and re-alleged as paragraphs 76-86 of this Count Six as if fully set forth herein

87. At all times mentioned, Berti was an agent and authorized representative of defendants.

88. At all times herein, an agent-client relationship also existed between Berti and plaintiffs.

89. By virtue of the agent-client relationship that existed between Berti and plaintiffs, Berti owed a fiduciary duty to plaintiffs to act with the utmost care, loyalty and fidelity in servicing and maintaining the Policy, including but not limited to advising plaintiffs as to the financial management of the Policy and representing plaintiffs' interests when dealing with defendants.

90. Defendants failed to provide Berti with a true and accurate duplicate of the actual Policy such that Berti could not provide accurate and complete advice to plaintiffs. Defendants caused Berti to breach his fiduciary duty of care by the defendants' acts of misfeasance and malfeasance described herein, including but not limited to failing to provide Berti with the necessary information and the proper notices to pay premiums on the Policy to ensure it would not terminate.

91. Defendants breached the fiduciary duty of loyalty and good faith by holding Berti out as plaintiffs' agent for the Policy while at the same time failing to disclose and/or simultaneously maintaining a relationship with defendants that influenced Berti's assistance and services to the plaintiffs.

92. As a proximate cause of defendants' aiding, abetting and causing breach of fiduciary duties to plaintiff for which defendants are responsible as principal, and under the doctrine of *respondeat superior* defendants are responsible for the harm and loss plaintiffs have suffered as damages in the form of the forfeited and terminated Policy.

**Count Seven**: Misrepresentation

1. Paragraphs 1-49 are repeated and re-alleged as paragraphs 1-49 of this Count Seven as if fully set forth herein.

50. Paragraphs 50-68 are repeated and re-alleged as paragraphs 50-68 of this Count Seven as if fully set forth herein.

69. Paragraphs 69-75 are repeated and re-alleged as paragraphs 69-75 of this Count Seven as if fully set forth herein.

76. Paragraphs 76-86 are repeated and re-alleged as paragraphs 76-86 of this Count Seven as if fully set forth herein.

87. Paragraphs 87-92 are repeated and re-alleged as paragraphs 87-92 of this Count Seven as if fully set forth herein.

88.   A.    At all times relevant, defendants made representations of material facts, including but not limited to, the delivery of a true copy of the Policy to plaintiffs which was not a true and accurate copy;

    B.    Using a false Policy to mislead and make it appear that the Policy was subject to termination after the expiration of a grace period resulting in forfeiture of the Policy and all the benefits it provided.

    C.    Withholding and omitting to inform plaintiffs of the truth regarding the Policy and the actual scope of the non-forfeiture protections.

    D.    As Variable Life Insurance, Jefferson-Pilot was required to disclose a risk benefit summary providing key information about the Policy's rate, benefits and fees. At all times relevant, defendants as successors were also obligated to keep the plaintiffs' informed of the financial risks of the Policy.

    E.    Jefferson-Pilot was required to provide a disclosure similar to a prospectus disclosing minimum and maximum costs of insurance charges that may be imposed and reveal how the cost of insurance charged increases over the life of the Policy. Such written disclosures should also

    (a) explain and disclose all charges deducted from premiums, cash value, assets or other sources; and the financial risks inherent in such a policy;

    (b) disclose minimum initial and subsequent premiums required, any limits on amounts or frequency of premiums that will be accepted, how long an insured/investor needs to pay interest and how to prevent lapse of a policy by paying a certain minimum level of premiums;

    (c) disclose differences between fixed and variable death benefit options; and

    (d) disclosure of Rates of Return that demonstrate how variable life insurance policies operate and the effect that underlying fund returns and earnings have on cash value and death benefits. .

89.    The defendants had the means of knowing the truth, ought to have known and had the legal duty to provide the truth to plaintiffs.

90.    Plaintiffs were induced to rely on the misrepresentations and fraudulent conduct of the defendants and justifiably relied until discovering the true and accurate Policy, <u>Exhibit "A"</u>

91. As a direct consequence of plaintiffs' reliance to their detriment, plaintiffs suffered harm, loss and damages by forfeiture and termination of the Policy.

92. Defendants contend the cash surrender value was insufficient to cover monthly deductions; however, to the extent a grace period did apply, and a potential lapse of the Policy, defendants were required to send lapse notices to plaintiffs last known address informing of the calculated shortfall and resulting premium payments required to prevent any Policy lapse.

93. The only way plaintiffs or Berti would know whether and to what extent a premium shortfall loomed and in what amount would be by receipt of the Policy lapse notices from defendants.

94. The plaintiffs have suffered damages as a result of Lincoln National's breach in the form of the terminated Policies.

95. Plaintiffs seek to be restored to the position they were before defendants' breach by having the Policy reinstated.

**WHEREFORE**, plaintiffs claim and pray for Relief on each Count, as applicable:

1. a declaratory judgment consistent with *Conn. Gen. Stat.* § 52-29; 28 U.S.C. § 2201; and F.R.C.P. Rule 57 that the Policy has not terminated and remains in full force and effect;

   Alternatively, that the Court order and declare that the Policy be immediately reinstated retroactive to December 8, 2020 on the tender of the true premium due;

2. a declaratory judgment consistent with *Conn. Gen. Stat.* § 52-29; 28 U.S.C. § 2201; and F.R.C.P. Rule 57 that the defendants have breached the Policy contract and terms and shall promptly reinstate the Policy retroactive to December 8, 2020;

3. an order in equity for equitable reinstatement of the Policy to prevent disproportionate and unfair forfeiture and termination;

4. the Court enter such other equitable relief as deemed necessary or appropriate to protect the rights of plaintiffs and preserve the Policy;

5. cost of disbursement;

6. just, fair and reasonable damages of One Million ($1,000,000.00 Dollars;

7. punitive damages for intentional wrongdoing, misrepresentation and concealment of the true Policy;

8. attorneys' fees under statute and exemplary damages at common law;

9. post judgment interest; and

10. any other relief which the Court may find to be just and fair to protect the plaintiffs and the Policy rights and benefit.

**PLAINTIFFS DEMAND TRIAL BY JURY**

Dated at New Britain, Connecticut, on the 9th day of November, 2021.

By: _____
Attorney Edward T. Lynch, Jr. ct 00047
Anderson, Reynolds & Lynch, P.C.
One Liberty Square, Suite 208
New Britain, CT 06051
Tel: (860) 893-0500
Fax: (860) 893-0550
E-mail: edlynch@arllawyers.com

Its Attorneys